# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Michael T. Mason | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 5821 | **DATE** | 11/27/2001 |
| **CASE TITLE** | Austin vs. Apfel | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Enter Memorandum Opinion and Order: Plaintiff's motion for remand [12-2] is granted. Plaintiff's motion for summary judgment [12-1] and defendant's motion for summary judgment [15-1] are denied as moot. This case is reversed and remanded to the Commissioner for further proceedings consistent with this opinion.

(11) ☐ [For further detail see order (on reverse side of/attached to) the original minute order.]

| | | | | Document Number |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | |
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | NOV 28 2001 | 17 |
| | Notified counsel by telephone. | | date docketed | |
| | Docketing to mail notices. | | | |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| | | | 11/27/2001 | |
| KF | courtroom deputy's initials | 01 NOV 27 PM 2:52 | date mailed notice | |
| | | Date/time received in central Clerk's Office | KF mailing deputy initials | |

# IN THE UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| ALVIN AUSTIN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | 00 C 5821 |
| v. ) | |
| ) | |
| WILLIAM A. HALTER, Commissioner ) of Social Security, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

Michael T. Mason, United States Magistrate Judge:

The plaintiff, Alvin Austin ("Austin") has brought a motion for summary judgment seeking judicial review of the final decision of defendant Halter,[1] who denied plaintiff's claim for disability insurance benefits ("DIB") and Supplemental Security Income ("SSI") benefits under the Social Security Act (the "Act") 42 U.S.C § 416(i), 423(d), 1382c; 20 C.F.R. §§ 404.1520(f), 416.920(f). Defendant Halter has filed a cross motion for summary judgment asking that we uphold the decision of the Administrative Law Judge ("ALJ") who originally heard the case, and the Appeals Board which reviewed the ALJ's decision. We have jurisdiction to hear this matter pursuant to 42 U.S.C. § 405(g) and for the following reasons we reverse and remand this case to the ALJ.

## Procedural History

Austin filed for DIB on September 16, 1996 asking for a period of disability dating back to July 15, 1995 (R. 119-122; 123-125), which was consolidated with his request

---

[1] At the time the complaint was filed, the Commissioner of Social Security was Kenneth Apfel.

for SSI (R. 235). His claims were denied initially and then again after his request for reconsideration. (R. 88-93, 97-99). On June 8, 1998, plaintiff participated in a hearing before ALJ Barbara Welsch regarding the denial of his claim for benefits. (R. 14). On October 30, 1998, Welsch issued a written opinion denying his claim. (R. 12-27). In her opinion, Welsch applied the five step sequential evaluation process required by 20 C.F.R. 404.1520 and 416.920 (R. 14), and concluded that Austin was not disabled pursuant to the Social Security guidelines, and thus not entitled to benefits. (R. 14). Austin then appealed the decision to the Appeals Council, which denied his request for review on July 19, 2000. (R. 5). Thus, the ALJ's decision became the final decision of the Commissioner of Social Security. *See Zurawski v. Halter*, 245 F.3d. 881 (7th Cir. 2001).

**Plaintiff's Testimony**

At the time of the hearing before the ALJ, Austin was a forty-seven year old man with an eighth grade education. (R. 26, 139). He testified generally that since about 1995 he had suffered from pain in his back, neck, knees, and arm. (R. 56-57). His right knee hurt more than his left knee, but at various times, his left knee would swell after bending or lifting. (R. 67-68). He also stated that at times, his neck would "lock up" and that he could not sit for long periods of time without back pain. (R. 57,73). Mr. Austin testified that he could not lift any weight with his left arm, and that his left elbow sometimes "locks up" as well. (R.71). He also told the ALJ that he might like to see a psychiatrist or counselor to discuss mental problems. (R. 57).

2

At the hearing before the ALJ, Austin testified that he had been performing security work off-and-on for the last two or three months. (R. 45-46). Previously, he had worked for a temporary service and, three years earlier, had worked for Elgin Corrugated Box. (R. 51, 52). He told the ALJ that he had been "pushed through school", and that he could only read small words. (R. 48, 49).

**Plaintiff's Medical Examinations**

On December 16, 1996, Austin met with D. Mehta, M.D., complaining of various pain in his arm, neck and knee, some of which stemmed from a work injury 2-3 years earlier. (R. 168). He told Dr. Mehta that he used a cane to walk but he did not bring one to his appointment. Dr. Mehta's conclusion was that Austin had some limitation of movement of his left elbow as well as thoracic scoliosis, but that he had bilaterally normal shoulder movement and normal neck motion. (R. 168-169). On January 10, 1997, Reynaldo Gotanco. M.D., reviewed the medical evidence and opined that "[t]he claimant has arthritic changes of the left leg and left elbow as a result of a previous injury." (R. 180). Dr. Gotanco noted that Austin's pain was responding to medication and that although his condition precluded heavy work, he was able to perform medium work. (R. 180).

On May 13, 1997, Mr. Austin again saw Dr. Mehta and reported that he was now using a cane full time and had generalized pain in his legs, arm, back and neck. (R. 170). Dr. Mehta again referred to Mr. Austin's scoliosis and noted that he could not completely extend his left arm. Dr. Mehta further noted swelling of the first and second metacarpal phalangeal joints on his left side, probably attributable to his previous injury, and that Mr. Austin's left hand grasp was weaker than his right. He concluded that Mr.

3

Austin had "generalized neck, back and extremity pain with some limitation in movement." (R. 170-171). On May 22, 1997, Mr. Austin's left elbow was x-rayed, which resulted in a finding of "ligamentous calcification lateral to the head of the radius", but the report noted that his degenerative changes were essentially unchanged since April, 1994. (R. 172).

In June of 1997, Bruce Donnelly, M.D., reviewed Dr. Gotanco's findings and concurred with them. (R. 173). Next, on July 25, 1997, Mr. Austin saw Kyung Koo, M.D., for his pain. (R. 189). He related that his problems probably stemmed back to a work-related injury three to four years earlier, and that he had undergone arthroscopic surgery on his knee. (R. 189) Dr. Koo observed that Mr. Austin had some muscle tightness on the right side of the neck and that he could only extend his left elbow to 150 degrees, not 180 degrees. (R. 190). Dr. Koo also observed slight changes in Mr. Austin's arthritis condition but no heat, tenderness or effusion. (R. 190). He noted no limitation of motion of the right knee and found that the rest of Mr. Austin's peripheral joints were normal. His back, as found by previous physicians, indicated scoliosis with forward bending to 90 degrees and backward bending to 30 degrees. In conclusion, Dr. Koo found "limitation of extension of the left elbow from previous injury and arthroscopic surgery, muscle spasm and tightness in the neck and scoliosis." (R. 190). Dr. Koo also found that Mr. Austin's neurological exam revealed normal muscle tone and strength, and that although he had a somewhat abnormal gait, he did not require a cane or crutch. (R. 190)

4

After Mr. Austin saw Dr. Koo, Robert Patey, M.D., performed a "residual physical functional capacity assessment"[2] (R. 181) on August 8, 1997, and after considering Mr. Austin's impairments, opined that he could perform a range of medium work including, *inter alia*, occasionally lifting up to fifty pounds, standing or walking for about six hours in an eight hour day, sitting for about six hours per workday, and pushing and pulling as long as he did not engage in prolonged pushing and pulling with his left arm. (R. 182). Dr. Patey noted that Mr. Austin's right knee had good range of motion but was painful, that his left elbow lacked 30 degrees of extension and that his gait leaned to the right, probably because of Mr. Austin's scoliosis. He also noted spasms and tightness in Mr. Austin's neck.

On February 23, 1998, Mr. Austin visited the emergency room of Sherman Hospital complaining of left knee pain and saw Willie Bruce, D.O. (R. 211, 218). Dr. Bruce observed swelling of the knee and noted that an x-ray revealed severe degenerative joint disease in the knee,[3] and gave Mr. Austin an injection of anti-inflammatory medication and sent him home with directions to take Tylenol three times per day and to follow up with his primary care physician within 48 hours.[4] (R. 211, 218)

---

[2] "Residual functional capacity" is that which a claimant can still do despite his physical and mental limitations. *Hickman v. Apfel*, 187 F.3d 683, 689 (7th Cir. 1999); 20 C.F.R. § 404.1545(a).

[3] Although some of Dr. Bruce's notes refer to Mr. Austin's "right" knee, all of the X-rays and other evidence shows that Mr. Austin came in for pain in his left knee, and it was in fact the left knee that was examined and treated. However, as we explain below, it appears that Mr. Austin sought treatment at different times for both knees, and the various medical reports recognize degeneration and arthritis in both knees.

[4] There is no evidence that Mr. Austin did return to his doctor within 48 hours as ordered.

Mr. Austin next saw a Dr. Applebaum at St. Joseph Hospital on March 8, 1998 for the purpose of having a "return to work" evaluation. (R. 208). Dr. Applebaum noted that Mr. Austin continued to suffer from problems in his right knee due to degenerative joint disease, as well as elbow debridement and arthritic changes to both knees. He also noted that Mr. Austin had an antalgic gait and recommended light duty work with opportunities to alternate sitting and standing, and no lifting over twenty-five pounds. (R. 208) Another physical residual function examination was performed on May 13, 1998 by George Andrews, M.D., who reviewed all of the medical evidence in Mr. Austin's file and, after giving Dr. Koo's exam controlling weight, concluded that Mr. Austin could perform a full range of medium work as long as he avoided frequent and repetitive flexion or extension of his left elbow. (R. 160-166).

On June 22, 1998, Mr. Austin went to the Elgin, Illinois Health Center complaining of pain in both knees and left elbow pain, stating that he was having difficulty getting out of bed. (R. 225). He saw a nurse practitioner who noted no swelling, redness, tenderness or deformity. The nurse recommended X-rays of both knees and scheduled an appointment for Mr. Austin with A. Herbstman, M.D., for July. (R. 225). Mr. Austin's knees were x-rayed on June 28, 1998. Lee Green, M.D. reviewed the x-ray and noted "fairly severe osteoarthritis change" in both knees. (R. 235). On July 16, 1998, Mr. Austin saw Dr. Herbstman for the same knee and elbow problems. (R. 223). Dr. Herbstman recommended a total knee replacement of Mr. Austin's left knee and also noted that previous elbow surgery performed by Mr. Austin's primary care physician Dr. Gitelis was "not doing well." (R. 223).

## Vocational Expert

At the hearing before the ALJ, vocational expert ("VE") Randall Strahl testified. He was asked to assume someone of Mr. Austin's age, education, and work experience who was limited to light work requiring no climbing or working at unprotected heights and no full extension of his non-dominant left elbow. (R. 77). The VE opined that given these limitations, Mr. Austin would not be able to perform his past relevant work and that there were no transferable skills. (R. 77-78).

When questioned about the possibility of unskilled entry-level work, the VE hypothesized that someone with Mr. Austin's medical limitations could hold the positions of security attendant (2,200 positions), inspector grader-sorter (2,400 positions), and sales attendant (3,400 positions). (R. 78). At a sedentary level of exertion, the hypothetical individual could work as an inspector (1,000 positions), ticket seller (3,200 positions), and charge account clerk (800 positions) (R. 77-80). When asked to additionally consider Mr. Austin's functional illiteracy, the VE opined that Mr. Austin could hold the job of charge account clerk position or the inspector job, and that Mr. Austin's limited use of his non-dominant arm would not affect his ability to perform these jobs. (R. 81).

## Legal Analysis

Austin argues that the ALJ failed to fully consider his combined impairments in concluding that he did not meet the Act's definition of impairment necessary to find him disabled and thus eligible for SSI and DIB. The Act sets forth a five step process to be used to determine whether an individual is disabled, and thus unable to engage in any

7

substantial gainful activity by reason of a medically determinable physical or mental ailment, 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). An individual is considered disabled only if he is neither able to perform any of his previous work or any other work existing in significant numbers in the economy. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); 20 C.F.R. §§ 404.1520(e),(f), 416.920(e)(f).

In making her determination, the ALJ applied the standard five step process set forth in the regulations, which required her to evaluate, in sequence; 1) whether the claimant is currently [un]employed; 2) whether the claimant has a severe impairment; 3) whether the claimant's impairment meets or equals one of the impairments listed in 20 C.F.R. § 404, Subpt. P, App. 1 ("Listing"); 4) whether the claimant can perform [his] past relevant work; and 5) whether the claimant is capable of performing work in the national economy. *See, Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000) *cited in Zurawski v. Halter*, 245 F. 3d 881 (7th Cir. 2001). Under the five part sequential analysis, "[a]n affirmative answer leads to either the next step, or on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a finding that the claimant is not disabled." *Zalewski v. Heck*, 760 F.2d 160, 162 n.2 (7th Cir. 1985).

The inquiry the Court must undertake when asked to review an ALJ and Commission decision is whether that decision is supported by substantial evidence. *See, e.g., Kendrick v. Shalala*, 998 F.2d 455, 458 (7th Cir. 1993). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971). A reviewing court may

8

not decide facts anew, reweigh the evidence, or substitute its judgment for that of the ALJ. *Powers v. Apfel*, 207 F.3d 431, 434 (7th Cir. 2000).

In undertaking the five step process, the ALJ first determined that for the purposes of her opinion, Mr. Austin was not currently gainfully employed.[5] (R. 15). Next, the ALJ determined that Mr. Austin suffered from the severe impairments of "postoperative changes of the left elbow, degenerative changes of both knees, and scoliosis of the thoracolumbar spine." (R. 16). However, the ALJ again expressed some hesitation at finding that Mr. Austin had a severe impairment at this stage, since his testimony indicated that he had held a job intermittently since the alleged onset of his condition and because his testimony about pain was not always consistent with the medical evidence. (R. 16).

The ALJ did not find for Mr. Austin at the third stage of consideration because she found that his various impairments to his neck, back, elbow and knees did not meet any of those in the Listing. In so holding, she noted that it was Mr. Austin's burden to provide evidence establishing the existence and severity of his impairment. 20 C.F.R. 404.1512(c) and 416.912(c), and that none of the doctors Mr. Austin had seen (including three at the government's expense in connection with his claim for benefits), demonstrated that Mr. Austin had such an impairment.[6]

---

[5] The ALJ expressed some doubt as to the accuracy of this assessment, since Mr. Austin testified that he had been working part-time as a type of security guard, checking employees' ID cards. However, the ALJ decided that two months at a part-time job was not sufficient to constitute gainful employment and thus found that he met the first step of the process.

[6] Part of the ALJ's decision was based on her determination that Mr. Austin was not entirely credible. For example, he told Dr. Mehta at his second appointment that he used a cane all the time, but then did not use a cane at his later appointment with Dr. Koo. Further, the ALJ noted that Mr. Austin had a tendency to exaggerate his

9

Mr. Austin argues that the ALJ did not properly and fully consider his combined impairments in concluding that they did not meet or equal a listed impairment under the Commissioner's regulations. The thrust of his argument concerns the ALJ's error in assuming that the "A. Herbstman" that Mr. Austin saw at the Elgin Health Clinic in July, 1998 who recommended a total knee replacement was a nurse practitioner, when actually, he was a medical doctor. In her opinion, the ALJ repeatedly refers to Dr. Herbstman as a nurse practitioner, and notes that none of the doctors who treated Mr. Austin recommended a total knee replacement. Mr. Austin argues that had the ALJ correctly recognized that Dr. Herbstman was a medical doctor, she would have taken his assessment and diagnosis into account and found that the arthritic condition of his knees rose to the level of a listed impairment,[7] or at the least ordered another medical exam by an orthopedic specialist, as was her right pursuant to the Regulations.

The Commissioner does not deny that Dr. Herbstman is a medical doctor, but instead argues that the ALJ considered and rejected Mr. Austin's arguments that he was disabled after discussing at length whether Dr. Herbstman was or was not a medical doctor. The Commissioner contends that the ALJ's decision was based on the fact that no doctor other than Dr. Herbstman had recommended a total knee

---

complaints of pain, as evidenced by the fact that he was currently working part time as a security attendant.

[7] Part 1.03 of the Listing sets forth the requirements for finding a claimant has disabling arthritis of a major weight bearing joint:
> With history of persistent joint pain and stiffness with signs of marked limitation of motion or abnormal motion of the affected joint on current physical examination. With:
> A.   Gross anatomical deformity of hip or knee (e.g. subluxation, contracture, bony or fibrous ankylosis, instability) supported by X-ray evidence of either significant joint space narrowing or significant bony destruction and markedly limiting ability to walk or stand.

10

replacement. In fact, the ALJ never identified Dr. Herbstman as a physician and completely discounted his opinion, incorrectly noting that <u>none</u> of the plaintiff's doctors had recommended a knee replacement.

Additionally, the ALJ also incorrectly believed that "nurse practitioner" Herbstman had made his recommendation without any basis for doing so and that no X-rays of Mr. Austin's knees were taken in June, 1998. However, pursuant to an order by nurse practitioner P. Wiczynski, whom Mr. Austin saw at the Elgin Health Center on June 22, 1998, both knees and his left elbow were x-rayed on June 29, 1998 at Sherman Hospital. (R. 235).[8] On October 30, 1998 – the same day the ALJ issued her opinion, Mr. Austin's attorney sent the ALJ a one-page report regarding the June 29th X-rays, in which Lee Green, M.D. noted "fairly severe osteroarthritic change seen bilaterally" in Mr. Austin's knees.[9] According to the plaintiff, the ALJ's errors, combined with the Appeals Council's later failure to associate these X-rays with Dr. Herbstman or his recommendation of a knee replacement, resulted in the incorrect determination that Mr. Austin did not satisfy the Listing and was not entitled to an additional medical exam.

**ALJ's Alleged Errors**

The Seventh Circuit has held that "where fact findings are unreliable because of serious mistakes or omissions, we reverse unless satisfied that no reasonable trier of fact could have come to a different conclusion." *Shramek v. Apfel*, 226 F.3d 809, 813

---

[8] The ALJ had asked Mr. Austin's attorney for the report regarding these X-rays prior to issuing her decision, but at the time, the attorney indicated that no X-rays existed other than those already in Mr. Austin's file. Plaintiff's attorney denies that he told the ALJ that no other X-rays existed, but instead told her that he had to get the X-rays directly from the hospital, which would take some time.

[9] The plaintiff implies that Dr. Herbstman reviewed the X-rays before making his recommendations and we have no evidence to the contrary.

11

(7th Cir. 2000) *citing Sarchet v. Chater,* 78 F.3d 305, 309 (7th Cir. 1996). A large portion of the ALJ's decision at Step Three was based on the following: 1) her belief that no medical doctor had recommended a total knee replacement; 2) her belief that "A. Herbstman" was a nurse practitioner who recommended a total knee replacement without any basis for doing so; 3) her belief that no X-rays were ever taken of Mr. Austin's knees after he visited the Elgin Health Center; and thus 4) that Mr. Austin's complaints of pain were inconsistent with the evidence and must be exaggerated. It is true that most of the doctors who saw Mr. Austin in 1996 and 1997 determined that he could perform medium work with few limitations despite the arthritic changes to his knees and elbow. However, beginning in early 1998 and continuing until the hearing in front of the ALJ, the doctors that saw Mr. Austin came to different conclusions that might suggest an increase in Mr. Austin's impairment and pain.

First, on February 23, 1998, Dr. Bruce noted that an X-ray revealed severe degenerative joint disease in the knee. On March 8, 1998, Dr. Applebaum also noted degenerative joint disease in his right knee[10] as well as arthritic changes in both knees. Additionally, Dr. Applebaum recommended light work with opportunities to alternate sitting and standing, in contrast to earlier assessments that recommended medium work. Next, when Dr. Andrews performed another residual function examination on May 13, 1998, he found Mr. Austin's complaints to be inconsistent, exaggerated, and not supported by the evidence, and opined that Mr. Austin could perform medium work.

---

[10] As we explained in footnote 2, Dr. Bruce had apparently confused Mr. Austin's right knee with his left when he was evaluating his complaints of pain, and that at various times, Mr. Austin complained of pain in either or both knees. There is no conclusion among all of the doctors who treated Mr. Austin about which knee had greater damage.

12

However, Dr. Andrews relied on the July, 1997 consulting examination of Mr. Austin by Dr. Koo, and apparently did not review the X-rays or notes of Dr. Bruce from the plaintiff's February 23, 1998 visit to Sherman Hospital. Instead, Dr. Andrews only reviewed Sherman Hospital's discharge instructions for Mr. Austin which did not mention the X-rays or Dr. Bruce's conclusions. (R. 164).

Because she did not believe Dr. Herbstman was a medical doctor, the ALJ could not assess the possibility that Mr. Austin's knee condition was worsening against the backdrop of Dr. Herbstman's evaluation and the new evidence provided by the X-rays taken on June 29, 1998. Both Dr. Bruce and Dr. Herbstman, who treated Mr. Austin's specific complaints of pain noted severe knee degeneration. "A treating physician's opinion regarding the nature and severity of a medical condition is entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record." *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000). However, because the ALJ did not consider Dr. Herbstman a physician, she could not fully evaluate the opinions of Mr. Austin's treating doctors or determine whether the opinions were inconsistent with the earlier consultative examinations.[11]

The ALJ specifically rejected Mr. Austin's request for an orthopedic consultative examination because she found that the medical evidence already before her was sufficient to resolve all inconsistencies, and that it substantiated her conclusions at the second, third, fourth and fifth stages of the evaluative process. (R. 17). As we

---

[11] We recognize that neither of these treating physicians met with Mr. Austin more than once, and thus, their opinions may not be entitled to as much weight as a doctor who treated a plaintiff over a long period of time. However, this does not change the fact that the ALJ did not assign any weight at all to Dr. Herbstman's recommendation because of her false perception about his credentials.

13

explained above, much of the ALJ's reasoning was based on an erroneous belief, and thus, an additional medical examination may have been proper.

## The Appeals Council

Before we conclude that the ALJ committed reversible error requiring a remand, we must also review the Appeals Council's apparent consideration and rejection of the new June 1998 X-ray evidence. Generally, a decision by the Appeals Council not to review an ALJ's decision – even if the Council has been presented with new evidence – is not reversible by this Court. *Perkins v. Chater*, 107 F.3d 1290 (7th Cir. 1999). In this case, the Appeals Council noted in its letter denying review that it had "considered the contentions raised in [Mr. Austin's] representative's letter . . .as well as the additional evidence also identified" (R. 5), and that neither provided a basis for changing their decision.

The problem is that we cannot determine whether the Appeals Council has also made a factual error. That is, it is not apparent from the record whether the Appeals Council ever realized that Dr. Herbstman was a medical doctor and thus gave adequate consideration to either his recommendation of a total knee replacement or to the June 1998 X-rays of Mr. Austin's knees. The administrative record only contains a copy of Dr. Green's review of the X-rays and Mr. Austin's attorney's analysis of Dr. Green's findings. It does not contain the information about Dr. Herbstman – his curriculum vitae and an argument by counsel that the ALJ made an error – that plaintiff's counsel contends he also provided to the Appeals Council prior to their decision.

If the Appeals Council held the same erroneous belief as the ALJ that no doctor had recommended a total knee replacement, then its consideration of the new X-ray evidence may not have been complete. After looking at all the evidence, we determine that this error is not harmless.

**Harmless Error Analysis**

In *Shramek, infra,* the 7th Circuit found that the ALJ had committed a potentially reversible error by mischaracterizing one physician's opinion and giving improper weight to the opinion of the plaintiff's treating doctor. However, in that case, the error was harmless because the ALJ's hypothetical to the VE included all of the limitations actually recommended by the plaintiff's doctors. 226 F.2d at 814. In this case, the ALJ's error affected not just Steps Four and Five of the process regarding his ability to work, but could have precluded her from making an accurate determination at Step Three about whether Mr. Austin's knee problems were serious enough to be considered a disability pursuant to the Listing; unlike in *Shramek*, we do not know whether the conclusions of all of the Mr. Austin's doctors were consistent.

It is true that Mr. Austin testified himself at the hearing that he had been performing part-time sedentary-level work for the two or three months prior to the hearing. The ALJ found that even Mr. Austin's part-time salary was in excess of the Regulation's definition of "substantial gainful activity." (R. 15) The VE testified regarding possible sedentary jobs Mr. Austin could hold, including the type of job he was currently performing part-time. However, if the ALJ had found Mr. Austin to be disabled at Step Three, she would not have considered any of this other evidence. *See, Zalewski,* 760

15

F.2d at 162 n.2. At the least, it is reasonable to conclude that a trier of fact faced with all of the information could have ordered an additional medical examination of Mr. Austin to assess his knee problems against the backdrop of Dr. Herbstman's recommendations and the other evidence of Mr. Austin's possibly worsening knee condition.

Therefore, we remand this case to the ALJ to reconsider her Step Three analysis of Mr. Austin's condition in light of Dr. Herbstman's conclusions and Mr. Austin's June, 1998 X-rays. It is so ordered.

Michael T. Mason
United States Magistrate Judge

Date: <u>November 27, 2001</u>